UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

REBECCA L. DONNELLY,              )
                                  )
            Plaintiff,            )
                                  )
      vs.                         )      Case No. 4:13-CV-352 (CEJ)
                                  )
CAROLYN W. COLVIN, Acting         )
Commissioner of Social Security,  )
                                  )
            Defendant.            )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On April 27, 2010, plaintiff Rebecca Donnelly filed an application for a period of disability and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of December 1, 2006. (Tr. 123-29). After plaintiff's application was denied on initial consideration (Tr. 64-70), she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 73-75).

Plaintiff and counsel appeared for a hearing on August 25, 2011. (Tr. 27-57). On September 20, 2011, the ALJ issued a decision finding that plaintiff was not disabled before March 30, 2008, the date she was last insured. (Tr. 13-26). The Appeals Council denied plaintiff's request for review on December 26, 2012. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

In her Disability Report (Tr. 138-48), plaintiff listed her disabling condition as multiple sclerosis. She worked as an administrative clerk in the communications business from January 16, 1978 until November 1, 2002, when she was laid off. (Tr. 141). She briefly worked as the manager of a fireworks stand during the summer of 2005. Plaintiff's medications included Avonex[1] to treat her multiple sclerosis, a nonsteroidal anti-inflammatory medication to treat the flu-like side effects of Avonex, and medications to treat incontinence and high blood pressure. (Tr. 143).

Plaintiff completed a Function Report on May 21, 2010. (Tr. 156-66). Her daily activities included watching television, attempting household chores, visiting her son, talking on the phone, or going places with her husband. She provided some care for the family pets. She managed her personal care without assistance and did not need reminders to take medication. She did not prepare any of her own meals. She completed some cleaning chores about once a month. She was able to drive a car and go out alone. She occasionally shopped. She was able to pay bills, handle a checkbook and savings account, and count change. She spent time with others at least once a week. Plaintiff had difficulties with standing, squatting, walking, and seeing, and her condition affected her sleep. She could follow written and spoken instructions. She had no difficulty managing stress or changes in routine. In a narrative section, she wrote that her condition varied from day to day. On bad days, she experienced fatigue and incontinence. She stated that her leg muscles hurt and

---

[1]Avonex, or Interferon beta-1a Intramuscular Injection, is an immunomodulator used to decrease the number of episodes of symptoms and slow the development of disability in patients with relapsing-remitting multiple sclerosis. It has not been shown to help patients with chronic progressive multiple sclerosis. http://www.nlm.nih.gov /medlineplus/druginfo/meds/a693040.html (last visited on Mar. 5, 2014).

she could hardly walk. She described vision problems in which "your eyes feel like at halloween wearing those eyeballs on springs and bobbling around."[2] (Tr. 163).

Plaintiff completed an updated Disability Report after her application was denied on initial consideration. (Tr. 169-74). She stated that an MRI had revealed new lesions in her brain and that she had begun to stumble and fall. Her husband helped her to get up and to cook and dress.

## B. Testimony at Hearing

Plaintiff was 52 years old at the time of the hearing. She graduated from high school. She lived with her husband who retired from Lucent Technologies in 2001. (Tr. 41). Plaintiff worked for Lucent as an administrative assistant until 2002 when she was laid off as part of a reduction in force. (Tr. 32). Plaintiff testified that she applied for other jobs without success. (Tr. 42). She did not know she might be eligible for Social Security disability until 2010 when her husband applied for Social Security retirement benefits. (Tr. 52).

Plaintiff was diagnosed with multiple sclerosis in 2006. After she was diagnosed, she was hospitalized for five days for treatment with Solu-Medrol[3] to reduce brain inflammation. She had another admission in 2010 following a flare-up. (Tr. 38-39). She testified that the multiple sclerosis caused severe fatigue, "the bobble head" vision problem described above, poor bladder and bowel control, and depression. She also experienced pain and weakness in her right leg. She was often awakened by severe pain. She testified that she slept in a chair because the bed was not comfortable; she

---

[2]This is the so-called "bobble head feeling" plaintiff described at her hearing.

[3]Solu-Medrol, or methylprednisolone sodium succinateinjection, is a corticosteroid administered intravenously. http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a601157.html (last visited on Jan. 30, 2014).

typically woke up after two or three hours of sleep, only falling back to sleep after two or three hours of being awake. She occasionally fell because her balance is poor. Her symptoms were exacerbated by exertion. She identified low back pain and high blood pressure as additional medical problems.

Plaintiff testified that her fatigue had worsened over time. At the time of the hearing, she napped for one to three hours every afternoon. Regarding her vision problems, plaintiff testified that her eyes were not well-coordinated: she felt as though they were going "in all directions," and objects appeared to be going back and forth. She was no longer able to read the newspaper because she could not focus her eyes. She testified that even when she looked at the ALJ, it appeared as if he was moving back and forth. Her condition was not improved by doing eye exercises. Regarding her incontinence, plaintiff explained that she did not "get a sign" that she needed to urinate so she liked to stay close to the restroom. She urinated every two hours and had frequent daily bowel movements. All of her symptoms had worsened over time. Plaintiff's ability to concentrate had deteriorated and she was diagnosed with depression. Her symptoms included crying, wanting to be left alone and becoming angry and walking away. She believed that depression would have interfered with her ability to focus on tasks in the workplace.

Plaintiff received weekly injections of Avonex to slow the progression of her multiple sclerosis. (Tr. 34, 38). The Avonex caused flu-like symptoms and severe chills which lasted for about a day. She also received injections of Rebif[4] three times

---

[4]Rebif, or Interferon beta-1a Subcutaneous Injection, is used to prevent episodes of symptoms and slow the development of disability in patients with relapsing-remitting multiple sclerosis. It is administered three times a week. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604005.html (last visited on Mar. 19, 2014).

a week to treat the "bobble head feeling," but the injections did not help. (Tr. 40). She was prescribed Lexapro to treat depression, Ultracet for pain, Vesicare for incontinence, and medication for high blood pressure. Plaintiff testified that she had gained about 40 pounds due to her medications. At the time of the hearing, she was 5', 9" tall, and weighed about 330 pounds.

Plaintiff testified that, before she was diagnosed with multiple sclerosis, she used to clean her house, cook, do laundry, mow the lawn, and decorate her yard for the holidays. She stopped doing chores because the exertion caused her to become imbalanced. Plaintiff testified that she stopped driving about a month or so after her diagnosis in 2006. (Tr. 42). This contradicts her statement in her 2010 Function Report in which she indicated that she was able to drive. At the hearing, she testified that she waited in the car while her husband did the shopping.

The ALJ noted that the medical record contained a notation that plaintiff was planning to start a retail business. She explained that it was her husband who opened and ran the business. She denied helping in the store. (Tr. 48). The shop was in operation for about two years.

Jeffrey F. McGroskey, Ph.D., a vocational expert, provided testimony regarding the employment opportunities for plaintiff between the time of her diagnosis in 2006 and her last insured date, March 31, 2008. (Tr. 53, 30). The ALJ asked Dr. McGroskey to assume that plaintiff was limited to performing light work, could spend "the better part of the day" standing and walking; could lift 20 pounds occasionally and 10 pounds frequently; and would be unable to perform work that required fine visual acuity. (Tr. 53-54). Dr. McGroskey opined that, with these limitations, plaintiff would be able to

perform light unskilled work, such as host or guide, bagging small items, light stocking work, and wrapping small items.  He excluded most clerical work because it required reading.   These jobs would not be suitable for someone who needed to use the restroom with the frequency plaintiff described.  (Tr. 55-56).

## C.  Medical Records

Plaintiff saw her primary care physician, Jorge Alegre, M.D., with complaints of sinus drainage and lightheadedness in late 2005.  (Tr. 296).  Radiologic studies of plaintiff's sinuses disclosed no abnormalities.   (Tr. 239).   Plaintiff began seeing chiropractor Toni Lane in early 2006, with complaints of pain in her low back, upper back, and neck.  She also complained of dizziness and pressure behind her eyes.  (Tr. 354-55).  In July 2006, Dr. Lane noted that plaintiff struggled to get up and walked with a noticeable limp.  (Tr. 355).

In October 2006, plaintiff underwent an MRI to investigate complaints of lightheadedness, unsteadiness, and migraine headaches.  A CT scan two weeks earlier had raised concerns of possible demyelinating disease.  (Tr. 234-35).   The MRI revealed multiple lesions consistent with multiple sclerosis.   The diagnosis was confirmed following a lumbar puncture.  (Tr. 222, 229).

Plaintiff began treatment with neurologist Max P. Benzaquen, M.D., on November 15, 2006.  (Tr. 255-56).  Plaintiff reported that she had been experiencing lightheadedness, pressure around her eyes and difficulties with balance.  She also reported that she had lost 100 pounds, which is inconsistent with Dr. Alegre's report in October 2006 that plaintiff had reduced her weight from 314 to 298 pounds.  (Tr. 292).   On examination, Dr. Benzaquen found that plaintiff had full ocular eye

-6-

movements with nystagmus[5] to both lateral end gazes. She did not have double vision and her cranial and bulbar nerves were normal. Tone was conserved in all four limbs and she had full muscle strength without partial weakness. She had good coordination of fine movements and no abnormalities in her gait. The results of an evoked potential vision test were abnormal, suggesting abnormality of optic nerves, optic tracts, and/or the visual cortex. (Tr. 230).

On December 13, 2006, Dr. Benzaquen admitted plaintiff to the hospital for treatment with Solu-Medrol. (Tr. 222-24). He noted that plaintiff's neurological symptoms first manifested about six months earlier when she started having trouble focusing her eyes and her walking became clumsy. She experienced increasing fatigue in the two weeks before she was admitted for treatment. She was alert and oriented with normal speech. Dr. Benzaquen's examination disclosed nystagmus and pale optic discs. The examination was otherwise unremarkable. At discharge, Dr. Benzaquen noted that plaintiff's fatigue and difficulty focusing her eyes had diminished.

On January 30, 2007, Dr. Benzaquen noted that plaintiff had finished a course of oral prednisone that he prescribed following completion of the Solu-Medrol. He wanted her to begin treatment with Avonex as soon as possible. (Tr. 253). In March 2007, Dr. Benzaquen noted that plaintiff had been treated with Avonex for 5 weeks, with Naprelan given before the treatment. She had right eye visual difficulties, right

---

[5]Nystagmus is a term to describe fast, uncontrollable movements of the eyes caused by abnormal function in the areas of the brain that control eye movements. http://www.nlm.nih.gov/medlineplus/ency/article/003037.htm (last visited on Mar. 6, 2014).

lateropulsion,[6] and meralgia paresthetica.[7]  (Tr. 251).  She was alert and oriented and moved her four limbs symmetrically.

Plaintiff received nine chiropractic treatments in March and April 2007.  She reported pain in her neck, buttocks, and right leg, with limping, weakness and fatigue. (Tr. 357-58).

In June 2007, Dr. Benzaquen noted that plaintiff was very fatigued and was having difficulty moving both eyes.  She was started on Amantadine.[8]  In August 2007, Dr. Benzaquen noted that plaintiff received weekly treatment with Avonex and Naprelan.[9]  She was also taking medication to manage her blood pressure and cholesterol.  Dr. Benzaquen described her as doing very well, and losing weight with diet and exercise.[10]  She still had problems with left lateral eye gaze because her right eye would not obey, but it was "not a big concern for her."  Strength and sensation were described as stable.  (Tr. 249).

---

[6]An involuntary sidewise movement occurring in certain nervous affections. Stedman's Med. Dict. 969 (27th ed. 2000).

[7]Burning pain, tingling, itching, or formication along the lateral aspect of the thigh due to entrapment of the lateral femoral cutaneous nerve.  Stedman's Med. Dict. 1093 (27th ed. 2000).

[8]Amantadine is used to treat Parkinson's Syndrome and similar conditions. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682064.html (last visited on Jan. 30, 2014).  It is sometimes effective in relieving fatigue in multiple sclerosis through some as-yet unknown mechanism.  See http://www.nationalmssociety.org/Treating -MS/Medications/Amantadine (last visited on Mar. 6, 2014).

[9]Also known as Naproxen, a nonsteroidal anti-inflammatory drug used for relief of the signs and symptoms of tendonitis and pain management.  See Phys. Desk Ref. 2769-70 (60th ed. 2006).

[10]Despite Dr. Benzaquen's note, plaintiff's weight on September 17, 2007 was 293 pounds, essentially unchanged from June 18, 2007.  (Tr. 288).

In November 2007, plaintiff saw Dr. Lane seven times.  She reported that her back and leg were "really flared up" and that it was hard to walk.  On November 20th, she reported that "[t]he pain is better, about a 5 out of 10 today."  She was trying not to walk too much.  (Tr. 358-59).

On December 11, 2007, Dr. Benzaquen noted that plaintiff's fatigue was better.  However, her depression was "terribl[e and] she is crying."  On examination, he found that her right eye movement had improved.  There were no abnormalities in her gait and cerebellar functioning.  (Tr. 248).  He discontinued Amantadine and prescribed Lexapro to treat depression.  An MRI on December 29, 2007, showed that the majority of lesions in plaintiff's brain had decreased in size while others had grown larger.  (Tr. 212).  During December 2007, plaintiff reported to Dr. Lane that her leg was weak and she found it hard to walk.  (Tr. 359).  In February 2008, Dr. Lane observed that plaintiff was "limping considerably."  (Tr. 360).

Plaintiff returned to see Dr. Benzaquen on March 4, 2008.  He noted that she "feels better since she started the Lexapro 10 mg daily."  She had resumed taking Amantadine.  On examination, Dr. Benzaquen noted that plaintiff's cranial nerves, motor functions, sensory functions, cerebellar functioning, and gait showed no abnormalities.  (Tr. 247).

In six visits to Dr. Lane in March 2008, plaintiff consistently complained of pain in her leg and buttocks.  On March 31, 2008, she reported that she was limping more each day.  (Tr. 360).  In April 2008, plaintiff continued to complain of weakness, pain, and difficulty with when walking.  (Tr. 361).  On May 14, 2008, she told Dr. Lane that she was "hurting a lot" and complained of a headache, low back pain, and increased limping.

On May 16, 2008, Dr. Alegre noted that Dr. Benzaquen had increased plaintiff's Lexapro dosage to 20 milligrams a day. (Tr. 285).

In June 2008, plaintiff told Dr. Lane that she had good days and bad days and that her good days were not as good as they used to be. In August, plaintiff told Dr. Lane that she was hurting and that "I just don't do anything anymore because I can't." (Tr. 361-62). She continued to complain of pain in September. (Tr. 363).

In September 2008, plaintiff went to the emergency department at St. Luke's Hospital for pain in her right foot. She was diagnosed with cellulitis for which she was prescribed antibiotics. (Tr. 200). Results of venous evaluation were consistent with normal deep venous system. (Tr. 206).

In October 2008, Dr. Benzaquen noted that plaintiff was "still very fatigued on Amantadine and it has not been helpful." He again discontinued the Amantadine and prescribed Provigil.[11] (Tr. 245). In November 2008, Dr. Alegre noted that plaintiff's weight had increased. (282). In December 2008, plaintiff complained of pain and numbness in her right arm, which Dr. Benzaquen attributed to radiculopathy at C7. He prescribed physical therapy. (Tr. 244). Between October and December 2008, plaintiff routinely reported to Dr. Lane that her activities were restricted due to neck, back and leg pain. (Tr. 363-64).

In February 2009, Dr. Benzaquen described plaintiff as having more energy and reported that she was "very happy" and that she had "started a retail office in St. Charles." (Tr. 243). Her radiculopathy had subsided. On examination he noted right

---

[11]Provigil, or modanifil, is in a class of medications called wakefulness promoting agents. It works by changing the amounts of certain natural substances in the area of the brain that controls sleep and wakefulness. http://www.nlm.nih.gov/medlineplus /druginfo/meds/a602016.html (last visited on Mar. 6, 2014).

eye internuclear opthalmoplegia.[12]  He saw her once more in June 2009, when he noted no difficulties.  (Tr. 242).  Dr. Alegre saw plaintiff in February, May and August 2009.  Plaintiff was generally stable and her hypertension was under control.  (Tr. 278-80).  Dr. Lane saw plaintiff twice in January 2009, when she complained of headache; five times in May for treatment of low back pain; and eight times in September and October 2009 for neck and back pain.  Plaintiff consistently reported that she could not walk very far and felt pain or weakness.  (Tr. 365-66).

Plaintiff experienced an exacerbation of her multiple sclerosis and was hospitalized for five days in June 2010 for treatment with Solu-Medrol.  (Tr. 315).  An MRI of her brain showed that "a few" new lesions had developed and some pre-existing lesions had increased in conspicuity or size.  (Tr. 324).  Dr. Benzaquen started plaintiff on Rebif three times a week.  (Tr. 340-41).  At an office visit in August 2010, Dr. Benzaquen noted that plaintiff had trouble walking at times and "turn[ed] to the left most of the time."  (Tr. 340).  In December 2010, Stephen Shields, M.D., performed an ophthalmology examination.  Her optic discs were pink and healthy and she had no ocular problems related to her multiple sclerosis.  (Tr. 326-28).  Plaintiff saw Dr. Lane 32 times in 2010.  She continued to complain of pain and weakness.  (Tr. 368-71).

In February 2011, Dr. Benzaquen described plaintiff as not doing well despite treatment with the immunomodulators Avonex and Rebif.  Nonetheless, she was

_____

[12]Internuclear ophthalmoplegia (INO) "is the classic visual problem of the eye movement system in MS" and "is the result of an inflammatory demyelinating lesion in the pathway joining the eye muscles that allows us to move both eyes simultaneously when looking to the side."  Nystagmus is the most common form of INO seen in patients with MS.  Edward J. Atkins, Eye Movement Abnormalities in MS, The Multiple Sclerosis Foundation, http://www.msfocus.org/article-details.aspx?articleID=382 (last visited on Mar. 6, 2014).

walking very well, despite cramping in her right leg.  (Tr. 338).  He proposed starting

plaintiff on Gilenya.[13]  In April 2011, he prescribed Dexedrine to help with plaintiff's

reduced stamina.  (Tr. 337).  In July, Dr. Benzaquen observed that plaintiff's gait was

ataxic with left lateropulsion and that she was using a cane when walking.  She no

longer wished to take Dexedrine.  (Tr. 336).  She had applied for disability due to her

difficulty working and heat intolerance.

Dr. Benzaquen completed a medical source statement on July 20, 2011.  (Tr.

372).  He opined that plaintiff could stand for one hour, walk for 30 minutes, sit for six

hours, and bend or stoop for one hour in an 8-hour workday; lift and carry no more

than 10 pounds; and was limited in her ability to push or pull.  She also could not "eye

target in coordination due to myalgias."  He stated that she "cannot perform

sustainable goal mediated activity."  He completed another medical source statement

on November 8, 2011, in which he stated that her symptoms "apparently" started in

2000.  (Tr. 375).  He identified her symptoms as chronic physical fatigue, decreased

visual acuity, and motor and sensory deficits, including clumsiness and abnormal

sensation in her hands and feet.  She was unable to tolerate the side effects of

interferon treatments and was taking the oral agent Gilenya, which she was tolerating

well.  Dr. Benzaquen noted that plaintiff also suffered from severe depression and

stated that she had "been evaluated to cognitively show certain decrease in her

abilities of cognition."  It was his opinion that she became unable to sustain full-time

---

[13]Gilenya, or fingolimod, is used to prevent episodes of symptoms and slow the
worsening of disability in patients with relapsing forms of multiple sclerosis.  It works
by decreasing the action of immune cells that may cause nerve damage.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a611006.html (last visited on
Mar. 6, 2014).

work before March 31, 2008, and he cited her need to rest her eyes when she experienced the "bobble-head" symptoms.

### III. The ALJ's Decision

In the decision issued on September 20, 2011, the ALJ made the following findings:

1. Plaintiff last met the insured status requirements of the Social Security Act through March 30, 2008.

2. Plaintiff did not engage in substantial gainful activity between December 1, 2006, the alleged onset date, and March 30, 2008.

3. Through March 30, 2008, plaintiff has the following severe impairment: multiple sclerosis.

4. Through March 30, 2008, plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Through March 30, 2008, plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b), except she has mild difficulty focusing on small objects.

6. Through March 30, 2008, plaintiff was unable to perform any past relevant work.

7. Prior to March 30, 2008, plaintiff was 49 years old, which is defined as a younger individual.

8. Plaintiff has at least a high school education and can communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding of "not disabled" whether or not plaintiff has transferable job skills. Beginning on August 31, 2008, plaintiff has not been able to transfer job skills to other occupations.

10. Through March 30, 2008, considering plaintiff's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that plaintiff could have performed.

11.     Plaintiff was not under a disability within the meaning of the Social Security Act at any time from December 1, 2006, through March 30, 2008, the date she was last insured.

(Tr. 18-23).

## IV. Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

In this instance, plaintiff presented new evidence to the Appeals Council. The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision. 20 C.F.R. § 404.970(b); Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000). The newly submitted evidence becomes part of the administrative record, even though the evidence was not originally included in the ALJ's record. Id. This Court does not review the Appeals Council's denial but determines whether the record as a whole, including the new evidence, supports the ALJ's determination. Id.

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five.  Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations."  Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own

description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether a claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v.

Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff argues that the ALJ incorrectly determined her RFC; improperly discounted her credibility; and improperly evaluated the medical opinion evidence. She also claims that the evidence submitted to the Appeals Council undermines the ALJ's RFC determination.

### A. The RFC Determination and Credibility Assessment

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Id. (citation omitted). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Id. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the

Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)).

The ALJ determined that, through March 30, 2008, plaintiff had the RFC to perform light work with an additional limitation on her ability to focus on small objects. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567.

The Court finds that the ALJ's RFC determination is not based on substantial evidence in the record as a whole. In particular, the ALJ failed to consider the records of chiropractor Dr. Lane; improperly characterized Dr. Benzaquen's record; failed to address all of plaintiff's relevant complaints; and improperly assessed plaintiff's credibility.

### 1. Dr. Lane's Records

The Social Security regulations separate information sources into two main groups: *acceptable medical sources* and *other sources*. *Other sources* is further divided into two groups: *medical sources* and *non-medical sources*. 20 C.F.R. §§ 404.1502, 416.902 (2007). Chiropractors qualify as "other" medical sources. 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1). "Other sources" cannot be relied upon to establish the existence of a medically determinable impairment, but may provide evidence to show the severity of impairments and how they affect the claimant's ability to work. 20 C.F.R. § 404.1513(d)(1); Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007) (discussing SSR 06-3p, 2006 WL 2263437).

The ALJ did not consider the records of plaintiff's chiropractic care. Plaintiff saw Dr. Lane thirty-four times from 2006 through March 31, 2008. Throughout that time, plaintiff repeatedly complained of weakness in her right leg and pain in her leg, neck, buttocks, and low back. See, e.g., Tr. 358 (On Nov. 20, 2007, plaintiff reported: "The pain is better, about a 5 out of 10 today.") Plaintiff reported that she was having trouble walking and that her husband was having to take care of more household chores because she was unable to do so. Dr. Lane observed on February 29, 2008, -- one month before the end of the insured period -- that plaintiff was limping considerably and had tenderness in the buttocks, thigh and groin. The symptoms reflected in Dr. Lane's notes are relevant to determining plaintiff's RFC and provide a contemporaneous record of plaintiff's symptoms before she knew she could apply for disability. The ALJ erred by failing to consider Dr. Lane's treatment records.

### 2. Dr. Benzaquen's Records

The ALJ found that Dr. Benzaquen's records "did not show much in the way of symptoms from 2006 through 2008 and **even after** her date last insured." (Tr. 21) (emphasis in original). However, in December 2006, plaintiff complained of fatigue, difficulty with eye movements, and lack of stamina. (Tr. 222-23). She displayed nystagmus and pale optic discs. During each of four office visits in 2007, plaintiff displayed difficulty moving her eyes, lateropulsion, and fatigue. An MRI on December 29, 2007, showed that, while the majority of lesions in plaintiff's brain had decreased in size, others had grown larger. (Tr. 212). In October 2008, Dr. Benzaquen noted that plaintiff was very fatigued and changed her medication in an attempt to address it. (Tr. 245).

-19-

The ALJ also noted that Dr. Benzaquen frequently reported that plaintiff had no abnormalities of gait. As discussed above, however, Dr. Lane frequently observed that plaintiff was limping.

The ALJ noted that, in December 2007, plaintiff told Dr. Benzaquen that she was terribly depressed and was crying. She started treatment with Lexapro and, on March 4, 2008, reported that she was feeling better. The ALJ stated that there were no further complaints of depression before her last insured date, March 30, 2008. However, on May 16, 2008, Dr. Alegre noted that Dr. Benzaquen had doubled plaintiff's Lexapro dosage, suggesting that she continued to have difficulty with depression.

In his July 2011 medical source statement, Dr. Benzaquen opined that plaintiff could not "eye target in coordination due to myalgias." This assessment is consistent with the frequent references in the treatment notes to plaintiff's nystagmus -- a term which describes rapid involuntary eye movements -- and the results of the evoked potential visual test in October 2006. The ALJ rejected Dr. Benzaquen's assessment, citing plaintiff's full visual fields and lack of double vision. There is no medical evidence in the record to indicate that inability to "eye target in coordination" only manifests in conjunction with double vision or results in less than full visual fields. The ALJ improperly substituted his medical opinion for that of Dr. Benzaquen. See Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990) (ALJ erred in substituting his opinion that plaintiff did not seem depressed at hearing for doctor's assessment of plaintiff's mental health); see also Pate-Fires v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009) (ALJs may not "play doctor"); Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). The ALJ also emphasized Dr. Benzaquen's notation that plaintiff's problems

with left lateral gaze were "not a big concern for her."  It was error to attach
significance to this comment without knowing the context in which it was made.

On remand, the ALJ should reconsider the weight to be given to Dr. Benzaquen's
opinion that plaintiff was unable to maintain full-time employment before March 30,
2008, due to her multiple sclerosis.

### 3.    Plaintiff's Additional Symptoms

Plaintiff complained that she suffered from fatigue, poor balance, and
exacerbation of her symptoms with exertion.  These complaints are relevant to
plaintiff's capacity to work an 8-hour day, and the ALJ erred in failing to address these
complaints.

### 4.    Credibility Determination

The ALJ found that plaintiff's statements regarding the intensity, persistence and
limiting effects of her symptoms were not credible to the extent that they were
inconsistent with the RFC determination.  It will be necessary to conduct a new
credibility determination once the errors discussed above are addressed.  There are
additional flaws in the credibility analysis that must be corrected.

Plaintiff worked steadily from 1975 until she was laid off in 2002.  (Tr. 134).  The
ALJ noted that she had good earnings until 2002, but cited the four years of
unemployment before her diagnosis as a factor in discounting her credibility.  He stated
that plaintiff "did not seek" further employment after 2002 because she considered
herself too old to be hired, even though she was only 42 years old.  To the contrary,
plaintiff testified that she applied for other jobs, but "they didn't hire" her because, she
guessed, she "was not qualified, too old."  (Tr. 42).  Plaintiff did not proffer her age as
a reason for not seeking employment, but as a possible explanation for not getting

hired. The ALJ's assessment of plaintiff's work history is thus based on a misunderstanding of her testimony. The ALJ also found it significant that plaintiff did not file for disability for more than three years after she was diagnosed with multiple sclerosis. However, she testified that she did not apply because she did not know that she might be eligible. It was error for the ALJ to rely on the delay in filing to discount plaintiff's credibility without expressly rejecting her explanation.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 25th day of March, 2014.